| | |
|---|---|
| Tommy French, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| CBL & Associates Properties, Inc., Stephen D. Lebovitz, and Farzana K. Mitchell, | |
| Defendants. | Jury Trial Demanded |

Plaintiff Tommy French ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his counsel, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, conference call transcripts, press releases issued by Defendants, and other publicly available documents, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant CBL & Associates Properties, Inc. ("CBL" or the "Company") common stock between August 8, 2013 and May 24, 2016, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      CBL, a real estate investment trust ("REIT"), purports to be one of the largest and most active owners and developers of malls and shopping centers in the United States, owning,

holding interests in, or managing more than 140 properties across 31 states. CBL is heavily reliant on external financing in order to acquire the assets that form the core of its business and to refinance its current assets on more favorable terms.

3.     In November 2015, a political watchdog group filed a complaint with the SEC alleging that Tennessee Senator Robert Corker, who has significant personal ties to CBL, may have engaged in insider trading of CBL stock using material, non-public information. CBL was not a named party in that complaint and refrained from comment on the allegations against Senator Corker.

4.     On May 24, 2016, after the markets had closed, the *Wall Street Journal* reported that CBL is under investigation by both the Federal Bureau of Investigation ("FBI") and the SEC for allegedly inflating the Company's "rental income and occupancy rates for its properties when providing those figures to banks" when applying for financing arrangements, according to former CBL employees who have been questioned by the federal agencies. The article also claimed that "FBI and SEC officials have also separately asked questions about the relationship between the company and Mr. Corker, who is close with senior executives at the firm and has made millions of dollars in profits trading the company's stock in recent years."

5.     On this news, CBL's stock fell by $0.86, nearly 9% on heavy volume, to close at $9.40 on May 25, 2016. This represented a loss in market capitalization of approximately $150 million.

6.     Throughout the Class Period, CBL made materially false and/or misleading statements and/or failed to disclose material facts about the Company, including, *inter alia*, that (1) certain of its employees may have provided material non-public information to Senator

Robert Corker; and (2) the Company failed to disclose to its shareholders that certain of its financing arrangements were obtained through fraud and/or misrepresentation.

7.     As a direct result of Defendants' wrongful acts and omissions in violation of the federal securities laws, and the precipitous declines in the market value of CBL's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

12.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff Tommy French is an individual residing in Baton Rouge, Louisiana. Plaintiff acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

14.     Defendant CBL is a Delaware corporation with its principal place of business in Chattanooga, Tennessee. The Company trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CBL". It operates as a REIT, and claims to be one of the largest and most active owners and developers of malls and shopping centers in the United States, owning, holding interests in or managing 145 properties, including 91 regional malls/open-air centers across 31 states.

15.     Defendant Stephen D. Lebovitz ("Lebovitz") is CBL's President and Chief Executive Officer ("CEO") and has held those roles at all relevant times to this litigation.

16.     Defendant Farzana K. Mitchell ("Mitchell") is CBL's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer, and has held those roles at all relevant times to this litigation.

17.     Collectively, Lebovitz and Mitchell are referred to throughout this complaint as the "Individual Defendants."

18.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the

4

issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and the access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## RELEVANT NON-PARTIES

19.    Robert Corker ("Senator Corker") is a United States Senator from Tennessee and has served in that role since 2007.

## SUBSTANTIVE ALLEGATIONS

### *Background*

20.    CBL purports to be one of the largest and most active owners and developers of malls and shopping centers in the United States, owning, holding interests in or managing 145 properties, including 91 regional malls/open-air centers across 31 states. CBL purportedly holds interests in a total 84.9 million square feet including 8.0 million square feet of non-owned shopping centers managed for third parties.

21.    CBL, headquartered in Chattanooga, Tennessee, was organized as a Delaware corporation in July 1993 and completed its initial public offering in November 1993. Since then, CBL has been listed on the NYSE.

22.    In conducting its business, CBL has represented that it is "significantly dependent upon external financing to fund the growth of our business and ensure that we meet our debt servicing requirements. Our access to financing depends on the willingness of lending institutions to grant credit to us and conditions in the capital markets in general."

23.     In November 2015, the Campaign for Accountability ("CFA") filed a complaint with the SEC and the Senate Select Committee on Ethics alleging that Tennessee Senator Corker may have engaged in insider trading of CBL stock and made false statements on his personal financial disclosure forms.

24.     The November 2015 CFA complaint against Corker alleged, among other things, that between 2007 and 2015, Corker and his family "carried out 70 trades of CBL stock…far more than any other stock in his portfolio." Some of the trades closely preceded announcements by CBL leading to changes in the stock's price, resulting in the senator making millions of dollars. In essence, the CFA complaint alleged, "Sen. Corker bought low, sold high, and failed to disclose his profit in the prescribed time."

25.     The CFA complaint detailed the suspicious nature of numerous trades in CBL stock executed by Senator Corker:

On July 26 and July 27, 2010, Sen. Corker sold his CBL stock in two trades collectively worth between $2 million and $10 million. Shortly thereafter, on August 5, 2010, UBS dropped its rating of CBL from "neutral" to "sell," causing a tumble in the stock's value: the day of the announcement, the stock slipped from $13.92 to $13.40. A week later, it registered a value of $12.55, and would subsequently fall even further.

Sen. Corker continued actively trading CBL stock in 2011, registering 14 total trades. As in 2010, on at least one occasion his trades closely preceded favorable ratings adjustments by UBS, resulting in a windfall, and on multiple occasions, his trades preceded announcements of CBL of new investments and acquisitions, which precipitated a boost in price.

Sen. Corker's first CBL trade of the year occurred on January 24, 2011, when he purchased between $500,000 and $1 million worth of stock at approximately $16.90/share. Notably, this purchase preceded a CBL conference call that announced better than anticipated results and disclosed new investments in four CBL properties, which preceded a weeks-long surge in the price of CBL.

On April 6, 2011, Sen. Corker bought another $500,000-$1 million worth of CBL stock, this time at about $17.51/share. CBL's stock price hit a three-month high on April 27, 2011 of $18.70. The same day, the senator sold a block of shares worth

between $1 million and $5 million. His investment on April 6 appears to have earned him between approximately $34,000 and $68,000 during that period.

(internal citations omitted).

26.     The CFA complaint also identified significant ties between Senator Corker and CBL:

Sen. Corker's ties to CBL date back to the origins of his professional life: he worked for a company whose primary business was subcontracting for CBL after college and then went out on his own, starting a construction company, and later his own very successful real estate development business, the Corker Development Company. When Sen. Corker was elected mayor of Chattanooga, CBL and Corker were the two largest developers in the county. CBL executives were the first and most generous donors when Sen. Corker filed to run for Senate in 2006, contributing $24,000, constituting 56% of his first day's take.

CBL executives, employees and their spouses have been among the senator's top campaign donors, contributing $88,706 to his campaign committee and PAC.

CBL executives also hold leadership positions in trade groups that have supported Sen. Corker's political career. Members of the Lebovitz family, which owns CBL, have for years served on the board of governors of the National Association for Real Estate Investment Trusts (NAREIT). Stephen Lebovitz, the president and CEO of CBL, is the current chair of the International Council of Shopping Centers (ICSC). These two groups were part of a nine-PAC consortium that held a fundraiser for Sen. Corker in Washington in 2011, and have donated $15,000 directly to his campaign committee since his arrival in the Senate. In the same period, CBL executives have contributed more than $50,000 each to NAREIT and the ICSC, indirectly funding Sen. Corker.

(internal citations omitted).

## *CBL's Materially False and Misleading Statements*

27.     The Company's Code of Ethics, which has remained unchanged since it was filed with the SEC on November 6, 2007 as an exhibit to a Form 8-K filed by the Company, states, in pertinent part:

### *Compliance with Laws, Rules and Regulations*

The Company proactively promotes the full compliance by all employees of applicable laws, rules and regulations of any governmental unit, agency or divisions thereof and the rules and regulations of the New York Stock Exchange

and/or any exchange upon which the Company's stock may be traded. The Company has adopted and will enforce its policies regarding an employee's trading in the stock of the Company based on inside information and will require employees to abide by such policy as well as provisions of applicable law on trading on inside information and all employees of the Company are directed to refrain from trading in the Company's stock based on inside information. The Company will require its employees to abide by applicable law and the Company's procedures with respect to "blackouts" (periods of time within which all or some cross-section of the Company's employees will be prevented from trading in the Company's stock). ***The Company will require its employees to abide by applicable law and the Company's policies with respect to disclosures of material non-public information (Regulation FD)***.

(emphasis added).

28.     On August 8, 2013, CBL announced its financial results for the three month period ending June 30, 2013 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

29.     The Company' Form 10-Q filed with the SEC for the period ending June 30, 2013, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

30.     On November 12, 2013, CBL announced its financial results for the three month period ending September 30, 2013 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

31.     The Company' Form 10-Q filed with the SEC for the period ending September 30, 2013, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell.

These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

32. On March 3, 2014, CBL filed with the SEC its annual report for its year 2013 on a Form 10-K, signed by Defendants Lebovitz and Mitchell, touting the Company's financing activities in 2013:

*Financing and Capital Markets Activity*

2013 was a transformational year as we achieved many of our financing objectives and long-term goals ahead of schedule. Highlights of financing and capital markets activity for the year ended December 31, 2013 include the following:

- Received investment grade ratings from Moody's Investors Service ("Moody's") and Fitch Ratings ("Fitch");
- Added the Operating Partnership as a public registrant and completed a $450.0 million 5.250% senior unsecured notes offering due in 2023 (the "Notes");
- Initiated a $300.0 million at-the-market ("ATM") equity program which, through the issuance of 8.4 million shares of common stock, generated $209.6 million in net proceeds;
- Redeemed all outstanding perpetual preferred joint venture units ("PJV units") of our joint venture, CW Joint Venture, LLC ("CWJV") with Westfield Group ("Westfield"), which were originally issued in 2007 in conjunction with the acquisition of four malls, for $413.0 million;
- Converted our third credit facility from secured to unsecured with a capacity of $100.0 million;
- Closed on two unsecured term loans totaling $450.0 million and retired a $228.0 million unsecured term loan;
- Completed financing of $416.6 million on new and extended loans on eight Properties owned in joint ventures and retired over $290.0 million in wholly-owned property-specific loans; and
- Increased our quarterly dividend by 6.5% in the fourth quarter of 2013 to $0.245 per share from $0.23 per share.

33. The Company' Form 10-K filed with the SEC on March 3, 2014 contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications

provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

34.    On May 5, 2014, CBL announced its financial results for the three month period ending March 31, 2014 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

35.    The Company' Form 10-Q filed with the SEC for the period ending March 31, 2014, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

36.    On August 11, 2014, CBL announced its financial results for the three month period ending June 30, 2014 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

37.    The Company' Form 10-Q filed with the SEC for the period ending June 30, 2014, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

38.     On November 10, 2014, CBL announced its financial results for the three month period ending September 30, 2014 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

39.     The Company' Form 10-Q filed with the SEC for the period ending September 30, 2014, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

40.     On March 2, 2015, CBL filed its annual report for its year 2014 on Form 10-K, signed by Defendants Lebovitz and Mitchell, touting the Company's financing activities in 2014:

*Financing and Capital Markets Activity*

We continue to progress in our strategy to build a high-quality unencumbered pool of Properties in addition to balancing our leverage structure. Highlights of financing and capital markets activity for the year ended December 31, 2014 include the following:

- completed a $300.0 million offering of 2024 Notes (as defined below) via our Operating Partnership;
- retired four loans with an aggregate principal balance of $285.9 million using borrowings from our credit facilities;
- recognized gain on extinguishment of debt of $89.4 million related to the transfer of three Non-core Malls to their respective lenders in settlement of $164.0 million of non-recourse debt;
- closed on a $126.0 million loan secured by our Coastal Grand - Myrtle Beach 50/50 joint venture. The 10-year non-recourse loan bears interest at 4.09% and was used to retire the existing $75.2 million loan, which bore interest at 5.09% and was scheduled to mature in October 2014;
- obtained permanent financing for The Outlet Shoppes of the Bluegrass through a 10-year $77.5 million non-recourse loan, of which the Company's share is $50.4 million, which bears interest at a fixed-rate

of 4.045% and replaces a $47.9 million variable-rate construction loan; and

- increased our quarterly dividend by 8.2% in the fourth quarter of 2014 to $0.265 per share from $0.245 per share.

41. The Company' Form 10-K filed with the SEC on March 2, 2015 contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

42. On May 11, 2015, CBL announced its financial results for the three month period ending March 31, 2015 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

43. The Company' Form 10-Q filed with the SEC for the period ending March 31, 2015, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

44. On August 10, 2015, CBL announced its financial results for the three month period ending June 30, 2015 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

45. The Company' Form 10-Q filed with the SEC for the period ending June 30, 2015, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell.

These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

46.     On November 9, 2015, CBL announced its financial results for the three month period ending September 30, 2015 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

47.     The Company' Form 10-Q filed with the SEC for the period ending September 30, 2015, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

48.     On February 29, 2016, CBL filed its annual report for its year 2015 on Form 10-K, touting the Company's financing activities in 2015:

*Financing and Capital Markets Activity*

We continue to progress in our strategy to build a high-quality unencumbered pool of Properties in addition to balancing our leverage structure. Highlights of financing and capital markets activity for the year ended December 31, 2015 include the following:

- obtained an investment grade rating of BBB- from Standard & Poor's Rating Services ("S&P");
- extended and modified our three unsecured credit facilities totaling $1.1 billion, reducing the borrowing spread to a rate of LIBOR plus 120 basis points and also reducing the annual facility fee to 25 basis points, based upon our current credit ratings, which represents an aggregate 25 basis points improvement over the rate on the previous facilities;

- closed on a new four-year (including extensions) $350.0 million unsecured term loan, bearing interest at LIBOR plus 135 basis points, based upon our current credit ratings;
- completed $314.5 million of new secured non-recourse financings at a weighted-average interest rate of 4.07%, representing a 178 basis point improvement over the interest rate borne by the maturing loans.

49.    The Company' Form 10-K filed with the SEC on February 29, 2016 contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

50.    During CBL's April 28, 2016, conference call, wherein the Company's first quarter 2016 results were discussed, Defendant Lebovitz stated that "[w]hile the financing environment continues to present a challenge, *we have found creative work-arounds to complete these recent transactions*." (emphasis added).

51.    On May 10, 2016, CBL announced its financial results for the three month period ending March 31, 2016 and filed the same with the SEC on Form 10-Q, repeatedly referencing its financing and refinancing activities and their impact on operations, including cash flows.

52.    The Company' Form 10-Q filed with the SEC for the period ending March 31, 2016, contained Sarbanes Oxley certifications signed by Defendants Lebovitz and Mitchell. These certifications provide, among other things, that the undersigned had reviewed the Form 10-Q and it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of CBL; were accurate in all material respects; and disclosed any material changes to the Company's internal control over finance reporting.

### *Allegations of CBL's Wrongdoing Begin to Emerge*

53.     On May 24, 2016, after trading had closed, the *Wall Street Journal* published an article reporting that, according to its unnamed sources, CBL is under investigation by both the FBI and the SEC for allegedly inflating the Company's "rental income and occupancy rates for its properties when providing those figures to banks" when applying for financing arrangements, according to former CBL employees who have been questioned by the federal agencies.

54.     The *Wall Street Journal* also reported that "FBI and SEC officials have also separately asked questions about the relationship between the company and Mr. Corker, who is close with senior executives at the firm and has made millions of dollars in profits trading the company's stock in recent years."

55.     As a direct result of this news, CBL's stock fell by $0.86, nearly 9%, to close at $9.40 on May 25, 2016, representing tens of millions of dollars in losses to investors.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired CBL common stock between August 8, 2013 and May 24, 2016, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

57.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

58.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether the Exchange Act was violated by Defendants;

b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e. Whether the price of the Company's stock was artificially inflated; and

f. The extent of damage sustained by Class members and the appropriate measure of damages.

59.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein. Plaintiff and other members of the Class purchased shares of the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

60.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FRAUD ON THE MARKET**

62.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

63. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements and omissions by Defendants.

## NO SAFE HARBOR

64. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

65.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

66.     On May 24, 2016, *The Wall Street Journal* reported that the Company may be under investigation by the FBI and SEC for possibly providing material non-public information to at least one investor, Senator Corker, who traded on the basis thereof, and that the Company may have misrepresented its occupancy and rental income rates in order to obtain financing, contrary to its public statements made beginning on November 6, 2007 and described above. At the time the market closed on May 25, 2016, the Company's stock declined by $0.86, or nearly 9%. This decline is directly attributable to the May 24, 2016 *Wall Street Journal* article reporting that the FBI and SEC may be investigating the Company and alerting the market to the possibility of fraud at the Company.

## CAUSES OF ACTION

### Count I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

67.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact

and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

70. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

<u>**Count II**</u>
**Violation of § 20(a) of the Exchange Act**
**(Against The Individual Defendants)**

71. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72. The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to CBL's SEC filings and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and

a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)     awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.


Dated: May 27, 2016                    Respectfully submitted,

                                       **BRAMLETT LAW OFFICES**

                                       *s/Paul Kent Bramlett*
                                       **PAUL KENT BRAMLETT**
                                       TN SUP CT #7387/MS SUP CT #4291
                                       **ROBERT PRESTON BRAMLETT**
                                       TN SUP CT #25895
                                       40 Burton Hills Blvd., Suite 200
                                       P. O. Box 150734
                                       Nashville, TN 37215
                                       Telephone:615.248.2828
                                       Facsimile: 866.816.4116
                                       PKNASHLAW@aol.com
                                       Robert@BramlettLawOffices.com

**Jeffrey C. Block**
**Steven P. Harte**
**Bradley J. Vettraino**
**BLOCK & LEVITON LLC**
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Emails: jeff@blockesq.com
        steven@blockesq.com
        bradley@blockesq.com

*Attorneys for Plaintiff*